Filed 5/2/13  In re J.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>S.C. et al.,<br><br>    Defendant and Appellant. | E056837<br><br>(Super.Ct.No. J226748 & J226749)<br><br>**ORDER MODIFYING OPINION AND DENIAL OF PETITION FOR REHEARING**<br><br>**[NO CHANGE IN JUDGMENT]** |

Appellant's petition for rehearing filed April 29, 2013, is denied.  The opinion filed in this matter on April 12, 2013, is modified as follows:

dOn page 16, the second sentence of the second full paragraph should read as follows:

At the jurisdiction/disposition hearing on September 8, 2011, the court set a .26 hearing and reduced visitation to once a month, conditional upon parents' release from incarceration.

1

Except for this modification, the opinion remains unchanged.  This modification does not effect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>
J.

We concur:

<u>HOLLENHORST</u>
Acting P.J.

<u>McKINSTER</u>
J.

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E056837 |
| Plaintiff and Respondent, | (Super.Ct.No. J226748 & J226749) |
| v. | OPINION |
| S.C. et al., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Maryann M. Milcetic, under appointment by the Court of Appeal, for Defendant and Appellant S.C.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant J.C.

1

Jean-Rene Basle, County Counsel, and Danielle E. Wuchenich, Deputy County

Counsel, for Plaintiff and Respondent.

I

INTRODUCTION

Mother appeals from an order terminating parental rights to her two sons, G.C.

(born in 2006) and J.C. (born in 2008).  Mother contends the juvenile court erred in

rejecting the beneficial parent relationship exception to adoption under Welfare and

Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1]  Mother also asserts that the

juvenile court violated her substantive due process rights and right to equal protection by

refusing to allow her sons to visit her while locally incarcerated.  Mother further contends

she was deprived of competent representation because her trial attorney did not request

in-custody visitation or object to the custody orders.[2]  Without filing a separate appellate

brief, father joins in and adopts mother's contentions on appeal to the extent mother's

arguments benefit his interests.  We reject mother's contentions and father's joinder, and

affirm the judgment.

II

FACTS AND PROCEDURAL BACKGROUND

On April 13, 2009, San Bernardino County Children and Family Services (CFS)

---

[1] Unless otherwise noted, all statutory references are to the Welfare and
Institutions Code.

took G.C. and J.C. (the boys) into protective custody, after mother and father (parents) were arrested and incarcerated for grand theft of $800 worth of alcohol from a grocery store. At the time, parents were using methadone for their heroin addiction and father was on parole. The boys were left in the care of their maternal grandmother (MGM), who lived with parents and the boys. According to MGM, parents stole from the grocery store because the family needed diapers and wipes for the boys and welfare aid had been recently terminated because parents failed to complete and return paperwork.

The family had a history of child welfare referrals, including in 2006, when G.C. tested positive for opiates, in 2007, when G.C. was left unattended with easy access to MGM's medications and the home was filthy, and in 2008, when G.C. was left unattended and wandered out of the yard. These referrals were closed as inconclusive or unfounded. There were two other open referrals alleging parents abused drugs and had neglected the boys.

On April 15, 2009, CFS filed juvenile dependency petitions under section 300, subdivisions (b) and (g). G.C. was two years old and J.C. was 11 months old. The petitions alleged that mother and father left the boys in the care of MGM, who was known to have been incapable of caring for the boys due to her own physical and mental conditions. In addition, the family home was filthy, with the furniture, counters, and floors covered with trash, food, dirty clothing, papers, toys, and animal feces. The boys

*[footnote continued from previous page]*

**2** On February 11, 2013, mother filed a petition for writ of habeas corpus on this issue (case No. E058041), which we ordered considered with this appeal. We will

*[footnote continued on next page]*

were extremely dirty and unkempt. Also, parents had a substance abuse problem that interfered with their ability to care for the boys. In addition, parents were arrested and incarcerated on April 13, 2009, and mother had a long history of drug use and drug-related arrests. She was enrolled in a methadone treatment program, was pregnant, and tested positive for morphine and cocaine in February 2009. G.C. tested positive for opiates when he was born in 2006.

In April 2009, the juvenile court ordered the boys detained, with reunification services ordered provided to parents and supervised weekly visits permitted upon their release from jail.

**Jurisdiction/Disposition Hearing**

The CFS social worker interviewed parents while in custody. Mother said she started using drugs, including heroin, marijuana, methamphetamine and cocaine, three years earlier, when she was 26 years old. Father was responsible for introducing her to drugs. Mother was not willing to give up on her marriage but was willing to do whatever it took to reunite with the boys, including separating from father. Father had an extensive criminal history and a long history of drug usage, beginning when he was 17 years old. Parents appeared committed to the boys and to each other. G.C. had delays in personal-social, fine motor-adaptive, and language skills. J.C.'s language and speech skills appeared delayed. The boys were placed together in a foster home and were adjusting well.

---

*[footnote continued from previous page]*
resolve that petition by separate order.

Mother was released from jail and attended the jurisdiction/disposition hearing on June 24, 2009. The juvenile court found the juvenile dependency petition allegations true and sustained the petition under section 300, subdivisions (b) and (g). The boys were maintained in foster care. The juvenile court authorized weekly supervised visits for the parents. Father remained incarcerated. Parents were ordered to comply with a service plan, which required them to participate in counseling, complete parenting and substance abuse programs, and participate in drug testing and a 12-step program.

**Six- and 12-Month Review Hearings**

CFS reported at the six- and 12-month review hearings that mother had done very well with services. She had completed her service plan, including participating in and completing a substance abuse program, graduating from Drug Court, testing negative for drugs, attending Alcoholics Anonymous/Narcotics Anonymous meetings, completing a parenting class, and participating in counseling. She also consistently visited the boys each week. Visits were increased to twice a week. At the six-month hearing, the court authorized return of the boys to mother and supervised visitation for father, upon his release from custody. Mother secured appropriate housing and in April 2010, the boys began overnight and weekend visits with mother. The boys appeared to be doing well in mother's care and were happy. Father was due to be released from state prison on June 30, 2010. Parents understood father was not to return to the family home until he had completed an outpatient program.

At the 12-month hearing on June 23, 2010, the juvenile court ordered the boys returned to mother, but not father. Mother was ordered to participate in family

5

maintenance services.  The court ordered father to participate in reunification services and authorized supervised weekly visitation upon his release from prison.  The juvenile court instructed mother that father was not to have any contact with the boys except through CFS and was not to stay at or visit the family home.

**18-Month Review Hearing and Settlement Conference**

CFS recommended in its December 2010 status review report that the dependency proceedings should be dismissed since parents were both compliant with their case plans and court orders.  The boys were happy living with mother and visiting father.  Parents were testing negative for drugs and father was close to completing his outpatient substance abuse program.  Parents wanted to remain married and live together.

At the 18-month review hearing on December 23, 2010, the matter was referred to mediation and set for a pretrial settlement conference.  At mediation, the parties agreed father could return to the family home and the juvenile dependency proceedings would be dismissed.  The juvenile court, however, ordered that the boys remain dependents of the court, remain in custody of mother, and return to father's custody.  Both parents were ordered to participate in the family maintenance case plan, which included participation in counseling, drug testing, and a 12-step program.

**Issuance of Warrants of Protective Custody**

On June 28, 2011, a CFS social worker visited mother's home and discovered the family had moved out.  The current tenant informed the social worker that mother had shown her the apartment five weeks earlier.  The social worker notified the police and

Deputy District Attorney's Child Abduction Unit in San Bernardino that the boys were missing.

On July 1, 2011, the juvenile court issued warrants of protective custody for the boys. According to the apartment manager, parents' apartment was left a total disaster, with trash and food strewn throughout the home. Parents left owing $1,500 in rent and did not leave a forwarding address. CFS located the family in Pottsville, Pennsylvania. Parents' parole officers were notified parents had left California without permission. The Deputy District Attorney's Child Abduction Unit filed a missing persons police report and the deputy district attorney took legal action against parents.

On July 14, 2011, parents were arrested in Pennsylvania and the Pennsylvania Children and Youth Services took the boys into protective custody and placed them in foster care. The boys were present when parents were arrested and handcuffed. A social worker in Pennsylvania reported that the family home was filthy, with trash everywhere, and mother had admitted to using heroin, cocaine, and other drugs. The boys had scabies. Through the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), Pennsylvania returned the boys to California. The boys were placed in a foster home in California.

**Supplemental Petition**

On July 21, 2011, CFS filed petitions under sections 342 and 387, alleging that parents removed the boys from their home and California without notifying CFS, and without the permission of CFS or the court. Parents violated their probation terms by leaving the state. As a consequence, parents were incarcerated for kidnapping and child

abduction, and were unable to provide support for the boys. At the detention hearing the juvenile court ordered the boys detained and denied reunification services.

**Supplemental Jurisdiction and Disposition Hearing**

CFS reported that, despite receiving two years of services, parents continued to violate the law and abuse drugs. Parents remained incarcerated in Pennsylvania. Mother's step-sister, Michelle, and her husband, Andrew, were interested in placement. They lived in Virginia. The juvenile court authorized CFS to initiate an Interstate Compact on Placement of Children (ICPC). At the jurisdiction and disposition hearing on September 8, 2011, the court found the supplemental petition allegations true and ordered the boys again removed from parents. The court also set a section 366.26 hearing (.26 hearing) and ordered visitation once a month, commencing upon parents' release from custody. The court denied mother's request for weekly supervised visitation upon her release, because there was already a preexisting order for monthly supervised visitation, which the court wanted to leave in place. In September or October 2011, mother was extradited back to California and placed in local custody.

**Section 366.26 Hearing**

CPS reported in the .26 hearing report filed in December 2011, that the boys had speech delays but were otherwise developing normally. Father remained incarcerated in Pennsylvania. While in custody, in August 2011, mother gave birth to another son, Je.C. He was living with the child's paternal aunt, Donna M., in Pennsylvania. Mother wanted G.C. and J.C. also placed with Donna. CFS did not approve placement with Donna because she had frequently interacted with parents before they were incarcerated. CFS

8

was concerned Donna would allow parents easy access to the boys. CFS favored placement with Michelle and Andrew, whom ICPC had approved. Twice a week the boys had "Skype" communications with Michelle and Andrew. G.C. and J.C. had not seen parents since the boys were removed in July 2011.

The boys underwent psychological evaluations by Dr. Michelle Molina on November 16, 2011. G.C. was almost five years old and J.C. was three and one-half years old. Molina reported that the boys had been living in a foster home in California for the past four months. During this placement, G.C. had mentioned mother and asked about her whereabouts. G.C. was hyper vigilant of his foster parents' presence and voice tone because of the traumatic circumstances of his removal from parents, when parents were handcuffed and arrested in the boys' presence. G.C. was a gregarious, cooperative child but also appeared sad and anxious. He frequently told Molina, "no feel good," and had a history of verbalizing sadness over disconnection with mother. G.C. remained capable of bonding with parental figures. Molina diagnosed G.C. with adjustment disorder with mixed disturbance of emotions and conduct. He also suffered from an expressive language disorder.

Molina recommended immediate adoption and mental health services, along with speech therapy, for G.C. When exposed to unfamiliar people, G.C. was hyper vigilant and experienced behavioral difficulties, including agitation and sleep and appetite problems. These behaviors likely would improve with consistent parenting, structure, stability and professional services. Since living in foster care, G.C. had made great

9

progress in his development.  He was more calm, emotionally stable, and responsive to parental requests.

Molina reported that J.C. was an adorable, cooperative child with anxious mood and flat affect.  J.C. had been traumatized by parents' arrest in his presence and removal from parents' custody.  J.C. reportedly had been saying, "Daddy bad.  They took [G.C.] Daddy in trouble."  He had also asked his foster parents, "Why can't I go to my house?"  When J.C. arrived at his current foster home, he had speech, motor development, behavior and emotional problems.  J.C. had an expressive language disorder and had developed a sense of fear and anxiety from changes in his living situation and neglectful parenting.  Since his placement in foster care, his behaviors had significantly improved.  However, J.C. had been removed from two preschools because of non-participation.  Molina diagnosed J.C. with adjustment disorder with mixed disturbance of emotions and conduct.  Molina noted that it was imperative J.C. be placed in a highly stable, structured environment with professional services.  As with G.C., she recommended immediate adoption.

In November 2011, mother unilaterally submitted a letter to the juvenile court attempting to explain why she took the boys to Pennsylvania and requesting a second chance with the boys, whom she loved very much.

In a supplemental .26 hearing report, CFS reported in March 2012, that the boys were not doing well in foster care.  In February 2012, their foster family wanted them removed from their home because the foster parents could not handle J.C.'s behavior,

which was out of control. J.C. suffered from nightmares and insomnia. During the day, he was unable to attend preschool because he could not handle too much social stimulus.

In March 2012, the juvenile court ordered the boys placed with Michelle and Andrew, over mother's objection. The boys' younger brother, Je.C., was also going to be placed with Michelle and Andrew. Michelle and Andrew had been contacting the boys two to three times a week and had travelled to California to see them. CFS recommended the boys be adopted by Michelle and Andrew, but requested continuance of the .26 hearing to allow for the permanent plan of adoption to be implemented. Mother remained incarcerated in California and father was incarcerated in Pennsylvania.

CFS reported in its supplemental .26 hearing report filed in June 2012, that the boys were placed with Michelle and Andrew on March 22, 2012, and were doing very well. Michelle and Andrew were eager to adopt the boys.

Mother attended the .26 hearing on August 1, 2012, having been released from custody two weeks earlier. Father also had been released but could not leave Pennsylvania. Mother testified at the hearing that she had last seen the boys on July 14, 2011, when she was arrested. She believed her children were still bonded to her, recognized her as their mother, and would be detrimentally affected by terminating her parental rights. Mother requested guardianship, rather than adoption, and placement with Donna, rather than with Michelle and Andrew. The boys' counsel agreed with CFS's recommendation of adoption.

The juvenile court found that parents had not maintained regular visitation and contact with the boys, and there was no benefit to continuing the parent-child

relationship.  The court ordered termination of parental rights and adoption as the permanent plan.

III

BENEFICIAL PARENT RELATIONSHIP EXCEPTION

The juvenile court found that G.C. and J.C. were adoptable and terminated parents' parental rights, finding no detriment to the boys in terminating parental rights. Mother appeals the termination, asserting that the juvenile court erred in rejecting the beneficial parent relationship exception to termination of parental rights.

*A.  Applicable Law*

At the section 366.26 hearing, the juvenile court's task is to select and implement a permanent plan for the dependent child.  When there is no probability of reunification with a parent, adoption is the preferred permanent plan.  (§ 366.26, subd. (b)(1); *In re Marina S.* (2005) 132 Cal.App.4th 158, 164.)  If the juvenile court finds by clear and convincing evidence that a child is likely to be adopted, the juvenile court must terminate parental rights, unless one of several statutory exceptions applies.  (§ 366.26, subd. (c)(1); *In re Marina S.,* at p. 164.)

Under section 366.26, subdivision (c)(1)(B)(i), the beneficial parent relationship exception may apply when a parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i); see *In re Derek W.* (1999) 73 Cal.App.4th 823, 826 ["parent has the burden to show that the statutory exception applies"].)  The "benefit" prong of the exception requires the parent to prove his or her relationship with the child "promotes the well-

12

being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].)  No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life."  (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.)  The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences.  Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship."  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; see also *In re K.P.* (2012) 203 Cal.App.4th 614, 621.)  The juvenile court may consider the relationship between a parent and a child in the context of a dependency setting, but the overriding concern is whether the benefit gained by continuing the relationship between the biological parent and the child outweighs the benefit conferred by adoption.  (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1155-1156; *In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

13

*B. Standard of Review*

California courts have disagreed as to the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. Most courts have applied the substantial evidence standard of review. We agree with the view expressed in the recent decision, *In re K.P., supra,* 203 Cal.App.4th at pages 621-622, "that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. . . . [W]hether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists . . . —is, because of its factual nature, properly reviewed for substantial evidence. [Citation.] The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a compelling reason for determining that termination would be detrimental to the child.' [Citations.] This '"quintessentially" discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption,' is appropriately reviewed under the deferential abuse of discretion standard. [Citation.]" (*In re K.P., supra,* 203 Cal.App.4th at pp. 621-622, quoting *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) We likewise apply the composite standard of review here.

14

## C.  *Maintaining Contact with the Boys*

Mother argues she satisfied the first prong, of maintaining regular visitation and contact with the boys, because she visited the boys to the fullest extent allowed.  While this may have been true, she did not have any contact with the boys for over a year preceding the .26 hearing.  This was because she was incarcerated from July 2011 until her release in July 2012.  Mother's own conduct led to the juvenile court not permitting visitation.  Furthermore, mother made no attempt to contact the boys.  She did not write the boys or talk to them on the telephone while incarcerated.  Also, she did not contact the boys or the social worker after her release from custody two weeks before the .26 hearing.  The evidence therefore supports the determination that mother did not maintain regular visitation and contact the boys.

## D.  *Detriment Arising from Terminating Beneficial Parent Relationship*

As to the second prong, we conclude mother's relationship with the boys was insufficient to constitute a compelling reason for not terminating mother's parental rights.  Mother had a history of using drugs, neglecting the boys, and living in squalor.  The boys suffered the adverse effects of having been removed from mother twice, both times because of mother's neglect and incarceration.  Psychological evaluations of the boys revealed that, because of these circumstances, the boys suffered from adjustment disorder with mixed disturbance of emotions and conduct.  The evaluating psychologist, Dr. Molina, concluded that the boys had been traumatized by these circumstances, including changes in their living situation and exposure to neglectful parenting.  In Molina's opinion, both boys had made tremendous progress while in foster care and needed

15

immediate stability to alleviate their high level of anxiety.  The boys had been placed in four different foster homes and had twice been removed from their mother's custody.  Because of the boys' need for stability, Molina recommended the juvenile court proceed with adoption of the boys as soon as possible.

There was also evidence presented at the .26 hearing that the boys had been placed in a good home with their stepaunt and her husband, who wished to adopt the boys.  The boys were happy there and had bonded with their prospective adoptive parents, with whom they had lived for five months.  Because of the boys' need for a stable, permanent placement was great and mother had not seen or contacted the boys for over a year preceding the .26 hearing, we conclude mother has not established that termination of parental rights would be detrimental to the boys.

IV

VISITATION

Mother contends the juvenile court violated her due process and equal protection rights by denying her visitation with the boys while mother was incarcerated from July 2011 to July 2012.

At the detention hearing on July 22, 2011, the juvenile court denied reunification services under section 361.5, subdivision (b), and ordered weekly, supervised visitation once parents were released from prison.  At the jurisdiction/disposition hearing on September 8, 2012, the court set a .26 hearing and reduced visitation to once a month, conditional upon parents' release from incarceration.  Mother did not object to the

16

visitation orders.  She also did not file a petition for extraordinary writ, objecting to the visitation orders or a section 388 petition requesting a change of the visitation order.

In September or October 2011, mother was extradited from Pennsylvania to California and incarcerated locally in the Devore/Rancho Cucamonga area, near the boys' foster home in Apple Valley.  Mother asserts that nothing in the record on appeal shows that, when denying her visitation while incarcerated, the juvenile court addressed the issue of detriment of visitation while incarcerated and factors establishing it.  Mother argues that the juvenile court cannot arbitrarily deny visitation to an incarcerated parent without providing analysis of how the court established detriment to the child.  (*In re Dylan T.* (1998) 65 Cal.App.4th 765, 773.)

Because mother did not object to the visitation orders in the juvenile court or file a writ petition challenging the orders, mother waived and forfeited her objections to the visitation orders.  (*In re Kevin S.* (1996) 41 Cal.App.4th 882, 885-887; *In re Elizabeth G.* (1988) 205 Cal.App.3d 1327, 1331.)

Furthermore, even assuming there was no waiver or forfeiture of the visitation, the visitation orders did not violate mother's due process or equal protection rights.  The general visitation statute, section 362.1, provides that "any order placing a minor in foster care, and ordering reunification services, shall provide as follows:  (1)(A)  . . . For visitation between the parent . . . and the child.  Visitation shall be as frequent as possible, consistent with the well-being of the child.  [¶]  (B)  No visitation order shall jeopardize the safety of the child. . . ."

17

Generally, visitation must be provided to incarcerated parents. (§ 361.5, subd. (e)(1).) Section 361.5, subdivision (e)(1) provides with regard to incarcerated parents that "the court shall order reasonable services" to incarcerated parents unless it specifically finds, by clear and convincing evidence, that the services would be detrimental to the child. The section goes on to specify the factors to be considered when making a finding of detriment: "In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime or illness, the degree of detriment to the child if services are not offered and, . . . any other appropriate factors. . . . Reunification services are subject to the applicable time limitations imposed in subdivision (a )." The section further provides that reasonable services may include visitation services, where appropriate.

Citing *In re Dylan T., supra,* 65 Cal.App.4th 765, mother argues that, because there was no showing of detriment, the juvenile court was required to order in-custody visitation. Mother's reliance on *Dylan T.* is misplaced. In *Dylan T.*, the juvenile court declared a one-year-old child a dependent of the court after the mother was sentenced to one year in jail. The juvenile court ordered a reunification plan but denied the mother in-custody visitation based on the child's young age. The *Dylan T.* court reversed the lower court order denying in-custody visitation on the ground there was no evidence that in-custody visitation would have been detrimental to the child. (*Id.* at p. 775.)

In reaching its ruling, the *Dylan T.* court noted that, "Although dictum in *In re Jonathan M.* [(1997) 53 Cal.App.4th 1234,] at page 1237 suggests that a specifically

18

listed factor in section 361.5, subdivision (e)(1) could stand on its own as a reason to deny visitation, the particular factor of the minor's age, without some supporting evidence demonstrating how the age of the minor resulted in detriment when visiting the incarcerated parent, cannot be utilized by itself to deny visitation. The court must consider each listed factor and any other additional factors when it determines detriment. Any one factor or combination of factors might result in a finding of detriment, but it must be shown by clear and convincing evidence how the factor or factors result in a detriment." (*In re Dylan T., supra,* 65 Cal.App.4th at pp. 773-774.)

The instant case in distinguishable from *Dylan T.* in that the record here shows that denial of in-custody visitation was not based solely on the boys' age. The court considered other factors, including the fact that mother was initially incarcerated in Pennsylvania. Although the court stated at the disposition hearing that there would be no in-custody visitation when mother returned to San Bernardino County, there was no objection to this condition. Unlike in *Dylan T.*, here, the boys' counsel did not request in-custody visitation, whereas Dylan's attorney did. Mother has not established that, under the circumstances in this case, either her due process or equal protection rights were violated. Mother has not shown that the court denied in-custody visitation arbitrarily without analysis.

V

INEFFECTIVE ASSISTANCE OF COUNSEL

Mother contends her trial court attorney's failure to request in-custody visitation constituted ineffective assistance of counsel. CFS argues that mother forfeited this claim

19

by failing to raise the claim by writ of habeas corpus, challenging the antecedent final order terminating reunification services and setting the .26 hearing. CFS recognizes there is an exception to this forfeiture rule when the parent can show "some defect that fundamentally undermined the statutory scheme so that the parent would have been kept from availing himself or herself of the protections afforded by the scheme as a whole." (*In re James J.* (1999) 74 Cal.App.4th 198, 208.) Without elaborating, CFS argues there was no showing of any fundamental defect. Mother argues that, here, the fundamental defect was that she was deprived of in-custody visitation up until her release, two weeks before the .26 hearing, and this deprived her of the opportunity to maintain a close bond with the boys sufficient to support the beneficial parent relationship exception.

Assuming for purposes of this appeal that denying in-custody visitation in this case constitutes a defect that fundamentally undermines the statutory scheme, we nevertheless conclude mother has not established ineffective assistance of counsel. We cannot say that mother's attorney's failure to request in-custody visitation constituted ineffective assistance of counsel because it was highly unlikely the juvenile court would have authorized it. "To demonstrate ineffective assistance of counsel, a defendant must show that counsel's action was, objectively considered, both deficient under prevailing professional norms and prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) To establish prejudice, a defendant must show a reasonable probability that, but for counsel's failings, the result of the proceeding would have been more favorable to the defendant. (*Id.* at p. 694.)" (*People v. Burgener, supra,* 29 Cal.4th at p. 880.)

20

"Although a claim of ineffective assistance of counsel is usually raised by way of a writ of habeas corpus, it may be effectively raised as part of an appeal in the rare case where the appellate record demonstrates 'there simply could be no satisfactory explanation' for trial counsel's action or inaction. [Citation.] As this court has previously explained, such a claim, made as part of the appeal, may be asserted even after the order terminating parental rights at the section 366.26 hearing. [Citation.]" (*In re S. D.* (2002) 99 Cal.App.4th 1068, 1077.)

The instant case is not one of the rare cases "where the appellate record demonstrates 'there simply could be no satisfactory explanation' for trial counsel's action or inaction." (*In re S. D., supra,* 99 Cal.App.4th at p. 1077.) There are valid reasons for mother's attorney not requesting in-custody visitation. At the time of the orders, mother was incarcerated in Pennsylvania and the children were young. J.C. was three years old and G.C. was four and a half years old. Even after mother was extradited to California and incarcerated locally, mother's attorney could have reasonably concluded it was not in the best interests of the boys to visit their mother in prison. The boys had been traumatized by parents' arrest in their presence, and suffered from adjustment disorder with mixed disturbance of emotions and conduct. Also, according to J.C.'s psychological evaluation, J.C. had developed a sense of fear and anxiety in many different situations. He was removed from preschool because of his maladaptive symptoms. There was good reason for mother's attorney not requesting in-custody visitation and not objecting to the court orders denying visitation until after mother was released from custody. Mother has thus not established ineffective assistance of counsel.

## VI

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

HOLLENHORST

Acting P. J.

McKINSTER

J.

22